**21 MAG 6557**

ORIGINAL

Approved: ______________________________
T. JOSIAH PERTZ
Assistant United States Attorney

Before: THE HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | SEALED COMPLAINT |
| - v. - | : | Violations of 18 U.S.C. §§ 1344, 1349, and 2 |
| EDUAR VIDAL, Defendant. | : | COUNTIES OF OFFENSE: BRONX and NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

MICHAEL MEMOLI, being duly sworn, deposes and says that he is a Postal Inspector with the United States Postal Inspection Service, and charges as follows:

COUNT ONE
(Conspiracy to Commit Bank Fraud)

1. From at least in or about June 2015 up to and including at least in or about March 2016, in the Southern District of New York and elsewhere, EDUAR VIDAL, the defendant, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

2. It was a part and an object of the conspiracy that EDUAR VIDAL, the defendant, and others known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the National Credit Union Share Insurance Fund ("NCUSIF"), and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent

pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

COUNT TWO
(Bank Fraud)

3. From at least in or about June 2015 up to and including in or about March 2016, in the Southern District of New York and elsewhere, EDUAR VIDAL, the defendant, willfully and knowingly, did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the NCUSIF, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, VIDAL, who operated an auto dealership in the Bronx, New York, endorsed multiple checks that had been issued by multiple financial institutions as auto loans - including, at times, multiple loans for the same vehicle - and kept a portion of the loan proceeds, knowing that the borrowers did not intend to purchase a vehicle.

(Title 18, United States Code, Section 1344.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4. I am a Postal Inspector with the United States Postal Inspection Service ("USPIS"). I have been personally involved in the investigation of this matter. This affidavit is based upon my investigation, my conversations with law enforcement agents and others, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Overview of the Loan Fraud Scheme

5. Based on my participation in this investigation, I have learned the following, in substance and in part.

a. From at least in or about June 2015 up to and including at least in or about March 2016, EDUAR VIDAL, the defendant, received proceeds of a loan fraud scheme, described further below, in which VIDAL assisted co-conspirators in taking out purported auto loans when the co-conspirators in fact sought the loan proceeds for unrelated purposes, including attempting to improve the co-conspirators' credit scores.

b. The scheme generally functioned as follows. VIDAL, who operated a car dealership in the Bronx, New York (the "Vidal Dealership"), would allow a co-conspirator to use a vehicle identification number ("VIN") for a particular vehicle on the co-conspirator's application for an auto loan. The lending financial institution would issue a check to the co-conspirator and the Vidal Dealership for the loan amount, subject to a written understanding with the lender that the loan proceeds would only be used to purchase the particular vehicle, and that the vehicle would not be used as collateral for any other loan. VIDAL, who would co-endorse the loan check with the co-conspirator borrower, would cash the check representing loan proceeds, deliver a portion of the funds to the co-conspirator, and keep a portion of the funds for himself.

c. On several occasions, with VIDAL's knowledge and agreement, a co-conspirator applicant used the same VIN on applications for loans from multiple financial institutions. This caused multiple financial institutions to issue loans for the full purported purchase price of a single vehicle - loans from which VIDAL took a percentage, despite knowing that the loans were not used to purchase the vehicle.

d. Although VIDAL's auto dealership at times issued bills of sale in the names of the co-conspirator applicants, VIDAL would receive loan proceeds without actually providing vehicles to his co-conspirators, and would reassure his co-conspirators that no vehicle purchases were necessary.

Background on VIDAL

6. Based on my review of a New York State driver's license for EDUAR VIDAL, the defendant, I am familiar with VIDAL's signature, which is distinctive. I have also reviewed signature cards for accounts at several financial institutions for which VIDAL is an authorized user, and have observed that VIDAL has signed these signature cards in the same distinctive way.

7. Based on my review of account records from several financial institutions, I have learned that EDUAR VIDAL, the defendant, is a signatory on multiple accounts in the name of the Vidal Dealership, whose address is in the Bronx, New York. VIDAL is listed on account opening documents as the president of the Vidal Dealership.

The Fraudulent Loans for a 2012 BMW X6

8. Based on my review of loan documents and bank deposit records from several financial institutions,[1] I have learned, among other things, the following. Between on or about June 17, 2015 and July 22, 2015, at least five different auto loan applications were filed at different financial institutions, all seeking loans to purchase the same vehicle, namely a 2012 BMW X6 (the "2012 BMW") with VIN ending in 4482 (the "2012 BMW VIN"). Each financial institution provided an auto loan on the basis of each application (collectively, the "2012 BMW Loans"), and the recipient of each loan payment was the Vidal Dealership, controlled by EDUAR VIDAL, the defendant. The loan applications (collectively the "2012 BMW Loan Applications") and the accompanying transactions are as follows:

a. Based on my review of loan documents and deposit records from one of the financial institutions ("Financial Institution-1"), I have learned the following, in substance and in part. On or about June 17, 2015, a loan applicant ("Loan Applicant-1") applied for a loan from Financial Institution-1 to purchase the 2012 BMW ("2012 BMW Loan Application-1"). On or about June 24, 2015, Financial Institution-1 issued a check for $46,489.63, made out to the Vidal Dealership. The check was endorsed with the signature of VIDAL. On the reverse of the check, where VIDAL signed, was printed the following statement, in part: "Endorsement of this check acknowledges receipt of payment in full by payee and/or any endorser (collectively the 'Payee') for the vehicle described below . . . ." The 2012 BMW VIN was printed below that text.

b. Based on my review of loan documents and deposit records from a second financial institution ("Financial

[1] Certain documents that I have reviewed in the course of this investigation were originally written in Spanish. I have reviewed and relied upon English translations of document contents.

Institution-2"), I have learned the following, in substance and in part.

i. On or about June 23, 2015, Loan Applicant-1 applied for a loan from Financial Institution-2 to purchase the 2012 BMW ("2012 BMW Loan Application-2"). In connection with 2012 BMW Loan Application-2, Loan Applicant-1 signed a loan agreement with Financial Institution-2. The loan agreement contained a provision entitled "OWNERSHIP OF THE PROPERTY," which stated, in part, "You promise that you own [the vehicle], or, if this Loan is to buy the Property, you promise you will use the Loan proceeds for that purpose. You promise that no one else has any interest in or claim against [the vehicle] that you have not already told us about. You promise not to sell or lease the [vehicle] or to use it as security for a loan with another creditor until the Loan is repaid. You promise you will allow no other security interest or lien to attach to the Property either by your actions or by operation of law."

ii. On or about June 27, 2015, Financial Institution-2 issued a check for $29,772.99, made out to the Vidal Dealership and Loan Applicant-1, with the 2012 BMW VIN printed on the reverse. The check was endorsed with VIDAL's signature.

c. Based on my review of loan documents and deposit records from a third financial institution ("Financial Institution-3"), I have learned the following, in substance and in part.

i. On or about June 27, 2015, Loan Applicant-1 applied for a loan from Financial Institution-3 to purchase the 2012 BMW ("2012 BMW Loan Application-3"). In connection with 2012 BMW Loan Application-3, Loan Applicant-1 signed a loan agreement with Financial Institution-3. This agreement contained a provision that stated, in part, that Financial Institution-3 "has been granted a security interest or lien in or upon the [vehicle] . . . Except for [Financial Institution-3's] interest or lean, the [vehicle] is owned free and clear from any adverse claim, security interest or encumbrance other than as now disclosed to [Financial Institution-3]."

ii. On or about June 27, 2015, Financial Institution-3 issued a check for $46,489.63, made out to the Vidal Dealership and Loan Applicant-1. On the reverse of the

check was printed a statement which read, in substance and in part, that Financial Institution-3 "is to be listed as the only legal lien holder" on the vehicle described below. Below that text was the 2012 BMW VIN, the handwritten name of the Vidal Dealership, and VIDAL's signature.

d. Based on my review of loan documents and deposit records from Financial Institution-3, I have learned the following, in substance and in part. On or about July 22, 2015, a second loan applicant ("Loan Applicant-2") applied for a loan from Financial Institution-3 to purchase the 2012 BMW ("2012 BMW Loan Application-4"). On or about August 5, 2015, Financial Institution-3 issued a check for $47,000.00, made out to the Vidal Dealership and Loan Applicant-2, with the 2012 BMW VIN printed on the reverse. The check was endorsed with VIDAL's signature.

e. Based on my review of loan documents and deposit records from a fourth financial institution ("Financial Institution-1"), I have learned the following, in substance and in part. On or about July 22, 2015, a third loan applicant ("Loan Applicant-3") applied for a loan from Financial Institution-1 to purchase the 2012 BMW ("2012 BMW Loan Application-5"). On or about July 29, 2015, Financial Institution-1 issued a check for $47,360.63, made out to the Vidal Dealership, with the 2012 BMW VIN printed on the reverse. On the reverse of the check, which was endorsed with VIDAL's signature, was printed the following statement, in part: "Endorsement of this check acknowledges receipt of payment in full by payee and/or any endorser (collectively the 'Payee') for the vehicle described below . . . ." The 2012 BMW VIN was printed below that text.

f. Based on my review of account records from Financial Institution-4, I have learned that the checks issued by financial institutions in connection with the 2012 BMW Loans were cashed at various check cashing stores.

<u>The Fraudulent Loans for a 2013 BMW BX6</u>

9. Based on my review of loan documents and deposit records from several financial institutions, I have learned, among other things, the following. Between on or about July 9, 2015 and July 17, 2015, at least four different auto loan applications were filed at different financial institutions, all seeking loans to purchase the same vehicle, namely a 2013 BMW BX6 (the "2013 BMW") with VIN ending in 44803 (the "2013 BMW

VIN"). Each financial institution provided an auto loan on the basis of each application (collectively, the "2013 BMW Loans"), and the recipient of each loan payment was the Vidal Dealership, controlled by EDUAR VIDAL, the defendant. The loan applications (collectively the "2013 BMW Loan Applications") and the accompanying transactions are as follows:

a. Based on my review of loan documents and deposit records from a fifth financial institution ("Financial Institution-5"), I have learned the following, in substance and in part. On or about July 9, 2015, Loan Applicant-2 applied for an auto loan from Financial Institution-5 ("2013 BMW Loan Application-1"). On or about July 16, 2015, Financial Institution-5 issued a cashier's check for $20,000.00, made out to the Vidal Dealership, "RE: [Loan Applicant-2]." However, the same day, the check was redeposited back into Loan Applicant-2's account at Financial Institution-5, essentially negating the loan. The following was handwritten on the check: "NOT USED FOR PURPOSE INTENDED." As described below, Loan Applicant-2 would receive loan proceeds from Financial Institution-5 at a later date.

b. Based on my review of loan documents and deposit records from a sixth financial institution ("Financial Institution-6"), I have learned the following, in substance and in part.

i. On or about July 12, 2015, Loan Applicant-2 applied for an auto loan from Financial Institution-6 ("2013 BMW Loan Application-2"). In connection with 2013 BMW Loan Application-2, Loan Applicant-2 signed a loan agreement with Financial Institution-6. The loan agreement contained a provision which stated, in part, "I agree that the vehicle(s) held as collateral on my loan cannot be sold without prior authorization of [Financial Institution-6]."

ii. On or about July 13, 2015, Financial Institution-6 issued a check for $47,905.00, made out to Loan Applicant-2. The 2013 BMW VIN was printed on the reverse. The check was endorsed with the handwritten name of the Vidal Dealership and VIDAL's signature.

c. Based on my review of loan documents and deposit records from Financial Institution-1, I have learned the following, in substance and in part. On or about July 13, 2015, Loan Applicant-2 applied for an auto loan from Financial Institution-1 ("2013 BMW Loan Application-3"). On or about July

14, 2015, Financial Institution-1 issued a check for $47,905.00, made out to the Vidal Dealership. VIDAL endorsed the check with his signature. On the reverse of the check was the following statement, in part: "Endorsement of this check acknowledges receipt of payment in full by payee and/or any endorser (collectively the 'Payee') for the vehicle described below . . . ." The 2013 BMW VIN was printed below that text.

d. Based on my review of loan documents and deposit records from Financial Institution-5, I have learned the following, in substance and in part. On or about July 17, 2015, Loan Applicant-2 applied for an auto loan from Financial Institution-5 ("2013 BMW Loan Application-4"). On or about July 17, 2015 Financial Institution-5 issued a check for $20,000.00, made out to the Vidal Dealership, "RE: [Loan Applicant-2]." The 2013 BMW VIN was written on the reverse of the check, which was endorsed with VIDAL's signature.

e. Based on my review of account records from Financial Institution-4, I have learned that, with the exception of the check issued by Financial Institution-5 for $20,000.00 on or about July 16, 2015, the checks issued by financial institutions in connection with the 2013 BMW Loans were cashed at various check cashing stores.

<u>The Fraudulent Loan for a 2016 Honda Accord Sport</u>

10. Based on my review of loan documents provided by Financial Institution-3, I have learned the following, in substance and in part:

a. On or about March 1, 2016, a fourth loan applicant ("Loan Applicant-4") signed a loan agreement with Financial Institution-3 (the "Financial Institution-3 Loan Agreement"). Under the terms of the Financial Institution-3 Loan Agreement, Financial Institution-3 provided Loan Applicant-4 with a loan for approximately $17,855.00, for the express purpose of purchasing a 2016 Honda Accord Sport (the "2016 Honda") with VIN ending in 4455 (the "2016 Honda VIN").

b. On or about March 11, 2016, a check dated on or about March 8, 2016 was negotiated at a check cashing store in New York, New York. Written on the reverse of the check was an endorsement noting, in substance and in part, that the endorsers of the check possessed legal interest in a 2016 Honda Accord with the 2016 Honda VIN, and certified that the check constituted complete payment for that property. The check was

made out to the Vidal Dealership and Loan Applicant-4, and signed by both Loan Applicant-4 and EDUAR VIDAL, the defendant.

11. Based on my discussions with other law enforcement officers and my review of interview reports and notes of interviews prepared by other law enforcement officers, I have learned that law enforcement has interviewed Loan Applicant-4.[2] In or about November 2017, Loan Applicant-4 began cooperating with law enforcement in the hope of obtaining leniency with respect to his/her participation in the fraudulent scheme described herein. Loan Applicant-4 has not received any payment from law enforcement. Over the course of several interviews with law enforcement, Loan Applicant-4 stated the following, in substance and in part:

a. In or about late 2015 or early 2016, an individual who purported to run a service that improved individuals' credit ratings ("Individual-1") told Loan Applicant-4, in substance and in part, that taking out an auto loan would improve Loan Applicant-4's credit. Individual-1 filled out an application for an auto loan on behalf of Loan Applicant-4, which resulted in Loan Applicant-4 receiving a check for loan proceeds. Individual-1 introduced Loan Applicant-4 to EDUAR VIDAL, the defendant, whom Individual-1 said was the owner of an auto dealership.

b. Loan Applicant-4 met with VIDAL, who told Loan Applicant-4, in substance and in part, that VIDAL would cash the loan proceeds check for Loan Applicant-4 and take a percentage of the proceeds as compensation. VIDAL also told Loan Applicant-4, in substance and in part, that Loan Applicant-4 did not have to take possession of a vehicle as part of this arrangement.

c. After VIDAL had cashed the check, VIDAL provided Loan Applicant-4 with a portion of the proceeds and kept a percentage for himself. Loan Applicant-4 never took possession of a vehicle from VIDAL.

d. On a separate occasion, Loan Applicant-4 co-endorsed another check with VIDAL, for which VIDAL again gave

---

[2] Loan Applicant-4 has a prior felony conviction for identity theft (2009). Information provided by Loan Applicant-4 has proven reliable and has been corroborated by independent evidence, including the loan documents and checks described herein.

Loan Applicant-4 a portion of the proceeds and kept a portion for himself. In relation to this check, Loan Applicant-4 likewise did not take possession of a vehicle from VIDAL.

12. Based on my review of a website maintained by the NCUSIF, I have learned that the deposits of Financial Institution-1, Financial Institution-2, Financial Institution-3, Financial Institution-5, and Financial Institution-6 are insured by the NCUSIF.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of EDUAR VIDAL, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

s/Michael Memoli, by the Court, with permission
MICHAEL MEMOLI
Postal Inspector
United States Postal Inspection Service

Sworn to me through the transmission of this Affidavit by reliable electronic means, pursuant to Federal Rules of Criminal Procedure 4.1, this 28th Day of June, 2021

[signature]

THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK