UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ---------------------------------------------------------- | x | |
| UNITED STATES OF AMERICA | : | |
| - against – | : | S1 21 Cr. 726 (DLC) |
| EDUAR VIDAL, | : | |
| Defendant. | : | |
| ---------------------------------------------------------- | x | |

**DEFENDANT'S RESPONSE TO THE GOVERNMENT'S MOTIONS IN LIMINE**

I. The Court Should Hold a Hearing Pursuant to Federal Rule of Evidence 104(a) to Determine Whether Alleged Co-Conspirator Statements Should be Admitted.

The Government contradicts itself with regard to the "clients" who, it alleges, participated in the conspiracy.[1] In its combined Motions in Limine and Memorandum of Law (hereinafter the "Brief"), the Government broadly states that "the client … would use this information [regarding a vehicle on Vidal's lot] to submit an application for an auto loan. (Brief, p. 6) In the next breath – and in the only example provided – the Government asserts that a client known as "Loan Applicant-4" did not in fact submit an application for an auto loan but rather authorized an individual labeled "Individual-1" to take steps to repair her credit. Loan Applicadnt-4 only learned "after the fact" that Individual-1 was applying for auto loans using falsified information. (Brief p. 8) The Government's portrayal shows Loan Aplicant-4 to be an unwitting victim, deceived by Individual-1, and not a member of the conspiracy charged in Count One of the indictment.

[1] "The Government anticipates that at trial, one or more of the clients who *participated in the conspiracy* will testify…." (Brief, p. 7)(Emphasis added.)

The Government must show that the charged conspiracy existed before any alleged co-conspirator statements can come into evidence through such clients. "Although it is usual and often necessary in conspiracy cases for the agreement to be proved by inference from acts, **the gist of the offense remains the agreement**, and it is therefore essential to determine what kind of agreement or understanding existed as to each [alleged co-conspirator]." *United States v. Cambindo Valencia*, 609 F.2d 603, 623 (2d Cir. 1979). Because hearsay statements of alleged co-conspirators are so devastatingly prejudicial, it is entirely appropriate that the Court determine this critical issue at a preliminary hearing pursuant to FRE 104(a). *United States v. Saneaux*, 385 F.Supp.2d 493, 497 (SDNY 2005).

The Government claims that Rule 801(d)(2)(E) permits the introduction of statements by uncharged co-conspirators, citing an unpublished Second Circuit opinion, *United States v. Paccione*, 2000 WL 34251719 (Feb. 3, 2000), as authority. (Brief, p. 9) The citing of an unpublished opinion earlier than 2007 violates FRAP 32.1 and is specifically prohibited by the Second Circuit's local rule. Moreover, even were the Court to consider the case, the Government has mis-cited it: *Paccione* did not affirm the admissibility of the evidence; rather, the Second Circuit held that admitting the evidence was error but the error was harmless. The Government also wrongly cites *Cambindo Valencia*, *supra*, for the proposition that the indictment need not even charge a conspiracy. *Cambindo Valencia*, a multiple conspiracy case, says no such thing.

Second, both the declarant and the defendant must be members of the conspiracy for any alleged co-conspirator statements to be admissible. *United States v. Lieberman*, 637 F.2d 95, 102 (2d Cir. 1980)("Before a coconspirator's statements are admissible against a defendant, the government must show that a conspiracy existed, that both the defendant and the declarant participated in it, that it was in existence at the time the statement was made, and that the

statement was made in furtherance of the conspiracy"). In its brief, the Government does not identify the other "clients" who are alleged to be members of the conspiracy, thus making their out of court statements admissible. At a preliminary hearing pursuant to FRE 104, the Government must establish facts necessary to show not only the existence of the conspiracy charged in Count One but these clients' membership in it.

Contrary to the Government's assertions, the "evidence" cited in its Brief does not establish either the existence of the charged conspiracy, Vidal's membership, or these clients' membership or participation. What is alleged is that Individual-1 submitted fraudulent auto loan applications to financial institutions on behalf of his clients and received checks on their behalf. The Government nowhere alleges that the banks or credit unions were harmed in any monetary way, i.e., that the fraudulent auto loans were not paid back by the clients. When Individual-1 submitted the applications and received the checks, the fraudulent conduct against the financial institutions was completed. As the Government is well aware from the proffer sessions, Vidal was often not present at the car dealership when Individual-1 would appear in Vidal's lot to look at and choose cars, or when he returned with the checks for those cars.[2]

Finally, the Government seeks wholesale admission of all alleged co-conspirator statements as being "in furtherance of the conspiracy" without identifying what those statements are. There is a conclusory reference that Loan Applicant-4 had "meetings" with Individual-1 and one of his associates, to help improve her credit. When she advised that she did not intend to purchase a car, Individual-1 responded that she could take the auto loan proceeds without

---

[2] *See, e.g.*, proffer session notes from December 18, 2018, p. 3: "He was not always at E&V when [Individual-1] or his employees would bring the client/check to E&V…" *See also* proffer notes of July 16, 2021 at p.2: Vidal "travelled to PA every weekend….When Vidal went to PA, Alberto Guzman would sell cars at the dealership. Alberto was friends with [Individual-1]." *See also* handwritten notes of July 16 2021 at p. 7: "Times when Alberto said Penelope would come to E&V for delivery of checks."

purchasing a vehicle so long as she made her payments to the bank. Other than that, however, the only statements referenced are statements made by Vidal, which are concededly admissions. (Brief, p. 8) The Government alleges that "the statements set forth above" and "the co-conspirator statements referenced above" (Brief, pp. 11-12) are all in furtherance of the charged conspiracy as required by Rule 801(d)(2)(E). However, since the Government cites to virtually no statements other than his own, Vidal is helpless to address or refute this point.

In sum, in order to make any cogent argument at all on the "in furtherance of the conspiracy" point, the Government must set forth all the statements that it alleges are in furtherance of the conspiracy and not try to "backdoor" these statements at trial, putting them in front of the jury before this Court has had a chance to rule on their admissibility. This is another reason why the Government should be made to present evidence on this point in a preliminary hearing pursuant to Rule 104(a).

## II. The Records of the Financial Institutions Are Not Admissible at Trial as Business Records Because They Contain Inadmissible Hearsay That the Government Heavily Relies Upon for the Truth of the Matter Asserted.

The difference between the financial documents in this case and ordinary bank records as business records is that the documents here contain extra hearsay matter in the form of the so-called "dealer agreement" placed after the fact on the back of the checks. This is rank hearsay, testimonial in nature, and its admission without a witness would violate Vidal's rights under the Confrontation Clause, pursuant to *Crawford v. Washington*, *supra*.

Each check the Government seeks to admit contains a statement added to the back of the check, to wit:

SPECIAL AGREEMENT OF DEALER

By endorsing this check, the payee-dealer agrees that
the collector of the proceeds of this check is subject to
and conditioned upon the requisition of the
[*in this line is handwritten the make and model of a vehicle*]
[*in this line is written the VIN number of a vehicle*]
in the name of [*handwritten the name of the purchaser*]
only and (2) the placement of [*name and address*
*of financial institution*] as the lien holder on the title of such vehicle.

This statement varies slightly between financial institutions but what is constant is the nature of the communication, placed on the check clearly in anticipation of litigation to protect the bank or credit union, and the fact that each statement has handwritten information about the vehicle and the name of the purchaser of the vehicle. Additionally, the statement is in the form of an inked stamp that is pressed onto the check by someone. *See, e.g*., check from Municipal Credit Union dated 6/27/2015, USAO #7267, attached hereto as Exhibit A.

This statement is clearly not part of the original check. When is this statement added? By whom is it added? Where does the information contained in the handwritten portion come from? Who conveys the information, and who writes it in? It may be written at the time of the endorsement of the check, or it may be written at the time the check is issued, or it may be written at the time of depositing the check, or at some time in between. This is not something subject to the business record exception, because there are additional layers of hearsay embedded within this stamped endorsement.

According to the Supreme Court in *Crawford*, "The text of the Confrontation Clause … applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' 2 N. Webster, An American Dictionary of the English Language (1828). 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a formal statement to government officers bears

testimony in a sense that a person who makes a casual remark to an acquaintance does not." 541 U.S. at 51.

Here, the Government seeks to prove that certain cars belonging to Vidal's car dealership were used to obtain fraudulent auto loans, a critical portion of the Government's case. During the plea hearing of May 10, 2022, the Government, at the Court's request, outlined how it would prove the charges against Vidal:

> The credit union would issue a check for the cost of the car, and **the check would state on its reverse that the check was for the purpose of buying a particular car. It would list the make and model of the car and the VIN of the car identifying it specifically.** Vidal would then endorse with his distinctive signature and cash the check, including once at least at a check cashing store in Manhattan. And he would keep a portion of the proceeds of the cash. The customer would not take the car. **And Vidal knew in advance that the customer would not receive the car, even though the financial institution required that this loan specifically be for a car.**
>
> If the matter had gone to trial, **the government would introduce**, among other things, loan documents issued by victim financial institutions; invoices issued by the defendant for the supposed sale of vehicles; and **checks issued by the victim financial institutions** then cashed by the defendant in order to prove the defendant guilty beyond a reasonable doubt.

Transcript of the May 10, 2022 Change of Plea hearing, p. 14, lines 3-21. The stamped "Dealer Agreement" is clearly testimonial as per Crawford in that it will be used to prove the truth of the matter asserted, to wit, that the check was for the purpose of buying a particular car with a unique VIN number, and that it was to be exclusively used for that purpose.

*United States v. Feliz*, 467 F.3d 227 (2d Cir. 2006), relied upon by the Government in its Brief, is not inapposite. There, the Second Circuit specifically stated that "because Rule 803(6) requires business records to be kept in the regular course of a business activity, records created in anticipation of litigation do not fall within its definition." 467 F.3d at 234. What is a "Special Agreement of Dealer" but a record created in anticipation of litigation? In other words,

the "special agreement" is affixed to the business record (here, the check) specifically to protect the financial institution from monetary harm and allow it – or others on its behalf – to litigate in the event that the proceeds are not used to purchase the specific vehicle identified.

Thus, under the facts of this case, the business records exception does not apply to the stamped endorsement on the back of the check. The Government must produce a witness to testify to the statements on the back of the check which are offered for their truth, so that Vidal has a fair opportunity to cross examine the witness pursuant to his constitutional right under the Confrontation Clause of the Sixth Amendment.

## III. The Advice of Counsel Defense

The Government attempts to prevent Vidal from offering any evidence whatsoever on the issue of intent unless it is first revealed to the government and vetted at a hearing before trial under Rule 104(a), so that it may be "cabined" – or, more accurately, exiled. Worse, under the guise of being concerned about an "advice of counsel" defense, the Government claims that Vidal "should not be permitted to advance through the back door what would amount to a *quasi-advice-of-counsel* defense…." (Brief, p. 27) In other words, Vidal can introduce no evidence whatsoever unless there is enough evidence to establish the elements of the advice of counsel defense.

However, the "quasi" defense is more commonly known as a failure of proof defense on the issue of intent. This defense stands even if Vidal's evidence on seeking legal advice doesn't meet the threshold that would mandate a jury charge on the good faith advice-of-counsel defense, and it should not be the subject of a preliminary hearing. Vidal has a constitutional right to introduce it during trial. It is admissible to show that he lacked the intent to commit the crime

because, after meeting with his lawyers, he believed that his actions were lawful. *United States v. White,* 887 F.2d 267, 270–71 (D.C.Cir.1989) (Ginsburg, J.).

At trial, a criminal defendant may assert, without bar, a so-called failure-of-proof defense. *See generally* Wayne R. LaFave, Criminal Law, § 9.1(a)(1), p. 586 (6th ed. 2017). A defendant raising such a defense will argue that the prosecution has not proven beyond a reasonable doubt some essential element of the crime charged. *Id*. *See also* 1. P. Robinson, Criminal Law Defenses, § 21 (1984) (A failure-of-proof defense is "in essence no more than the negation of an element required by the definition of the offense," and "the characterization of a given failure of proof as a defense rather than as a defect in proving the offense depends, for the most part, upon common language usage."). When a defendant presents this type of defense, "he is not doing so because he has a burden of proof to meet on the matter at issue, but only because the evidence received in the prosecution's case-in-chief, if left unanswered, might well result in the defendant's conviction." LaFave, supra, at 586. Indeed, the burden will remain at all times on the prosecution to disprove a failure-of-proof defense beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358 (1970); *Mullaney v. Wilbur*, 421 U.S. 684 (1975).

Nothing at all prevents an accused from simultaneously raising a failure-of-proof defense and another more specific defense such as advice of counsel, or an affirmative defense.

> As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor. *Stevenson v. United States,* 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896); 4 C. Torcia, Wharton's Criminal Procedure § 538, p. 11 (12th ed. 1976) (hereinafter Wharton). A parallel rule has been applied in the context of a lesser included offense instruction, see Fed. Rule Crim.Proc. 31(c); *Keeble v. United States,* 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973); *Sansone v. United States,* 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965). In *Stevenson,* this Court reversed a murder conviction arising out of a gunfight in the Indian Territory. The principal holding of the Court was that the evidence was sufficient to entitle the defendant to a manslaughter instruction, but the Court also decided that the defendant was entitled as well to have the jury instructed on self-

> defense. The affirmative defense of self-defense is, of course, inconsistent with the claim that the defendant killed in the heat of passion.
>
> Federal appellate cases also permit the raising of inconsistent defenses. See *Johnson v. United States,* 138 U.S.App.D.C. 174, 179, 426 F.2d 651, 656 (1970) (the defense in a rape case was permitted to argue that the act did not take place and that the victim consented), cert. dism'd, 401 U.S. 846, 91 S.Ct. 1258, 28 L.Ed.2d 523 (1971); see also *Womack v. United States,* 119 U.S.App.D.C. 40, 336 F.2d 959 (1964). And state cases support the proposition that a homicide defendant may be entitled to an instruction on both accident and self-defense, two inconsistent affirmative defenses. 4 Wharton § 545, p. 32.

*Mathews v. United States*, 485 U.S. 58, 63–64 (1988).

Thus, a defendant is permitted to introduce evidence that supports more than one defense, regardless of whether the defenses might be considered inconsistent with one another, or if one defense is a subset of another. "In a fraud case … the advice-of-counsel defense is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true. Rather, the claimed advice of counsel is evidence that, if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an 'unlawful intent.' *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir. 1989)." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017).

It is patently absurd for the Government to suggest that, if Vidal cannot make out all the elements of the advice of counsel defense, he must be precluded from introducing any evidence whatsoever on his *mens rea* after consulting a lawyer or lawyers, because it is likely to mislead the jury. By this reasoning, any evidence inconsistent with the prosecution's theory should be precluded because it may "mislead" the jury into believing the defendant is not guilty. To the contrary, the prosecution must carry its burden to prove Vidal's intent to defraud, and Vidal has

the right under the Sixth Amendment to refute the evidence on that element with other evidence tending to show an innocent state of mind.

Likewise, the Government's argument that this Court should preclude Vidal from "*any argument* in support of such a defense – including in the opening statement," (Brief, p. 27) fails because it gives the prosecution an unfair advantage – the advantage of persuasively opening with the details of its expected evidence, while preventing the defense from meeting that evidence by previewing for the jurors defense evidence that refutes one or more elements of the crime, thus preventing early adoption of the prosecution's arguments.

"The traditional order of events at a criminal trial-opening statements, presentation of evidence, summations, and jury instructions-has numerous purposes. Among these purposes is to enable juries to avoid forming opinions before the close of evidence and deliberations. This is reflected in trial courts' repeated instructions to juries to keep an open mind until deliberations. The traditional order also aids the defense in relying upon the presumption of innocence as a principal defense by forcing the prosecution to set forth its entire theory before a defense is framed." *United States v. Yakobowicz*, 427 F.3d 144, 150 (2d Cir. 2005). Certainly, if all the elements of the advice-of-counsel defense are not made out by the close of the evidence, then the defense will not be entitled to a jury charge on that defense.[3] However, whether the evidence previewed in opening meets all the elements of an advice-of-counsel defense is irrelevant

[3] The Government's lengthy arguments concerning notice and disclosure requirements in the instant case are specious and border on harassment. (Brief, pp. 22-24 and 26) Vidal initiated contact with the Government in 2018 regarding this matter, disclosed in each of four proffer sessions that took place between 2018 and 2021 his contact with two different counsel; during an ongoing proffer session, Vidal let prosecutors and agents call and speak to the first attorney who gave him advice; Vidal provided whatever supporting documentation he had; the Government then subpoenaed, met with, and extensively questioned Vidal's counsel and demanded whatever documents he had regarding his meetings with Vidal; and Vidal provided to the Government the name and contact information of the second attorney he spoke to. That the Government makes this somewhat manic demand for additional disclosure after Vidal has already turned over everything he possessed in the matter, and after the Government had what is tantamount to a deposition with counsel, is inexplicable. The conspiracy alleged in the superseding indictment ended over five years ago, in 2016. What possible additional disclosure does the Government think there is in this case?

because the defendant is entitled to raise and utilize any evidence that negates intent. *White, supra*.

IV. Introduction of Vidal's Proffer Session Statements

The Government's argument regarding what may open the door to Vidal's statements in the four proffer sessions that he voluntarily took part in and, indeed, initiated through counsel years before he was arrested or indicted, is premature – as the Government admits but still "writes to set forth the legal principles…." (Brief, p. 31) It thus appears to be a tactic of warning in its best light, and intimidation in its worst. Defense counsel is not prepared to respond to the possibility that future factual assertions or arguments by the defense at trial may trigger introduction of the proffer session statements – especially since, as the Government admits, many of the statements seem to contradict each other. This may have arisen due to how the questions were asked (e.g., asking for information in one way, then changing the words to elicit details on the same subject in another way, or asking aggressively or accusingly), or may even be due to the use of different Spanish interpreters who ask the questions or give the person's responses in a different manner with different wording.

Thus, the only thing that can be said at this time is that the proffer sessions statements may not be able to be used at all because they are inconsistent with one another and it would be fundamentally unfair to allow the Government to hold the sword of Damocles above the head of Mr. Vidal throughout the trial.

V. Potential Introduction of Non-Fraudulent Conduct

"When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's

conduct." Fed. R. Evid. 405(b). Here, as the Government well knows through the proffer sessions and through the bank records in this case, Vidal paid taxes on the money he characterized as the ten percent penalty he took when a client did not purchase a car, that he reported all cash deposited into his bank account on his tax return, and that he gave statements to his accountant and paid estimated taxes. Also identified in the proffer sessions are the facts that Vidal had a valid license to sell cars, and that he signed Individual-1 up with his own auction license so that Vidal would not have to deal with him anymore. These are examples of appropriate evidence that the defense may seek to admit at trial, showing an innocent state of mind which is directly relevant to the crimes charged. Because the Government routinely asks for a "conscious avoidance" charge in fraud cases, this is especially relevant.

The Government does not identify any specific "good acts" that Vidal engaged in which raise concerns of the type in the cited cases, save the fact that he ran a validly licensed car dealership at the time of the crimes alleged in the indictment, and that he conducted "legitimate business." (Brief, p. 37) These are not "non-criminal acts" within the meaning of the cases cited in the Government's brief, but rather relevant background material that provides context for the jury in assessing the facts and weighing credibility. "It is a well-recognized principle of our trial system that "determining the weight and credibility of [a witness's] testimony.... belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men*; see also United States v. Scop*, 846 F.2d 135, 142 (2d Cir.1988) ('The credibility of witnesses is exclusively for the determination by the jury….')." *Nimely v. City of New York*, 414 F.3d 381, 397–98 (2d Cir. 2005)(some citations omitted).

Additionally, FRE 405(a) permits the introduction of character evidence, that is, "testimony about the person's reputation or by testimony in the form of an opinion." Vidal reserves the right to call character witnesses at trial pursuant to this rule.

Respectfully submitted,

Camille M. Abate

Camille M. Abate, Esq.