CAMILLE M. ABATE, ESQ.
ATTORNEY AT LAW

Of Counsel, Nicholas Goodman & Associates
333 Park Avenue South, Suite 3A, New York, NY 10010
TEL: (212) 227-9003 • FAX: (212) 937-2112
c.abate71@gmail.com

October 10, 2022

Hon. Denise L. Cote
United States District Judge
500 Pearl Street
New York, New York 10007

**Re: Sentencing Submission on Behalf of Eduar Vidal**
***United States v. Eduar Vidal*, 21 Cr. 726 (DLC)**

**VIA ECF**

Dear Judge Cote:

In anticipation of sentence, currently scheduled for October 19, 2022 at 11:00 a.m., we respectfully submit this sentencing memorandum on behalf of Eduar Vidal. For all the following reasons, Mr. Vidal respectfully requests that the Court sentence him to a term of no more than 11 months' imprisonment, and that the Court consider allowing him to serve that time in home detention.

**Sentencing Factors Under 18 U.S.C. § 3553(a)**

The overriding mandate of § 3553(a) is that a sentencing court shall impose a sentence "sufficient, but not greater than necessary" to comply with the four purposes of sentencing set out in § 3553(a)(2): retribution, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(1). This is known as the "parsimony provision," which the Supreme Court has observed is the "overarching provision" of federal sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). A judge must consider the § 3553(a)(2) factors "when determining both whether to imprison an offender and what length of term to give him." *Tapia v. United States*, 564 U.S. 319, 328 (2011) (emphasis in original).

In addition, § 3553 requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s). 18 U.S.C. § 3553 (a)(1)-(7).

Congress has specifically directed that, in considering all of the § 3553 factors, a sentencing court must take into account Congress's finding that imprisonment does not promote correction and rehabilitation. *See* 18 U.S.C. § 3582:

> **§3582. Imposition of a sentence of imprisonment**
>
> (a) Factors To Be Considered in Imposing a Term of Imprisonment. - The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation. ...* (Emphasis added.)

The Supreme Court has made clear that a non-incarceration sentence is, indeed, punishment because probationers are "subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007). In addition, a sentence of probation means that the defendant "will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests," without the permission of his probation officer or the court. *Id.* at 44 (citing United States District Judge Robert Pratt's statement of reasons in Gall for imposing probation, rather than several years in prison).

A non-incarceration sentence can be, in the right circumstances, an optimal sentence, because it allows a defendant to rehabilitate in the community. As the Federal Probation Department has explained in the past, a non-incarceration sentence "holds people accountable for breaking the law" while "cost[ing] less than incarceration and giv[ing] people charged with or convicted of federal crimes the opportunity to live with their families, hold jobs, and be productive members of society."[1] Yet it does carry significant collateral consequences regardless of whether an incarceration sentence is imposed.[2]

To ensure that a non-incarceration sentence has teeth, Congress has directed that if a defendant violates the conditions of his probation or supervised release, he can be sentenced to "any . . . sentence that initially could have been imposed" in the case of probation and an additional prison term in the case of supervised release. *See* 18 U.S.C. § 3565(a)(2); 18 U.S.C. § 3583(e)(3). While some might argue that a non-incarceration sentence will not adequately deter Mr. Vidal, studies show rehabilitation and treatment reduce recidivism.[3]

---

[1] *See* United States Probation and Pretrial Services System-Supervision, U.S. CTS., http://www.uscourts.gov/services-forms/probation-and-pretrial-services/probation-and-pretrial-servicessupervision.

[2] *See* Margaret Colgate Love, Federal Sentencing & Collateral Consequences, COLLATERAL CONSEQUENCES RESOURCE CTR. (April 15, 2016), http://ccresourcecenter.org/wpcontent/uploads/2016/05/CCRC-Federal-Sentencing-Collateral-Consequences-4-2016.pdf.

[3] Joan Petersilia, Parole and Prisoner Reentry in the United States, 26 CRIME & JUST. 479, 518 (1999).

The Effect of Deportation on Sentence. The Second Circuit has held that when "determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may consider the uncertainties presented by the prospect of deportation proceedings and the impact deportation will have on the defendant and his family." *United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014). In *Thavaraja*, the court concluded that the district court's analysis of the relevant factors pursuant to 18 U.S.C. § 3553(a), including family circumstances and the specter of deportation, reflected a "thoughtful and principled consideration by a conscientious district judge of all the factors relevant to an individualized determination of a fair and just sentence." *Id.*

"Rehabilitative concerns weigh especially strongly against a term of imprisonment where the defendant is subject to deportation upon completion of a sentence…. [T]he Bureau of Prisons has effectively endorsed this position, opting to exclude from rehabilitation programs (e.g., drug treatment, job training) many prisoners subject to Immigration and Customs Enforcement detainers." *United States v. Chin Chong*, 2014 WL 4773978, at 9 (Weinstein, J., EDNY Sept. 24, 2014).

Mr. Vidal has been a legal permanent resident of the United States for 34 years. PSR ¶50. A sentence within the guidelines range makes any attempt to contest deportation out of the question. If the Court imposes a definite sentence of 11months, Mr. Vidal will have at least the opportunity to seek to remain in the USA. As discussed below, a definite sentence of 11 months complies with 18 U.S.C. 3553(a), because it is a sentence that is sufficient, but not greater than necessary, to comply with its purposes. If the Court were to allow Mr. Vidal to serve his time via home detention, it would provide him with a stronger opportunity to remain here, where his children – who are United States citizens – have lived their entire lives.

**Factors Under 18 U.S.C. 3553(a)(1)**

*The Nature and Circumstances of The Offense (including dispute of the loss amount):*

Eduar Vidal, also called Edward Vidal, had a used car dealership in the Bronx called EV Auto Sales Corporation. Prior to the events that are the subject of this indictment, Mr. Vidal ran his used car business in the ordinary fashion: he would purchase used cars at auction, fix them up if necessary, and sell them on his lot. At trial, it was undisputed that Mr. Vidal had a valid license as a used car dealer, was also licensed to purchase cars at auction, and he did in fact sell cars.

In 2015, Mr. Vidal met Carlos Félix through his accountant, Daniel Guillermo. Mr. Guillermo testified at trial that, in 2014, Mr. Vidal hired him to assist with the financial issues at Vidal's auto business. (Tr. at 527) Guillermo also testified that he had had bad credit since1993 with several judgments on his credit report, and that a friend introduced to him to a credit repair service run by Carlos Felix. Carlos Felix fixed his credit within six months of being retained to do so and "did an excellent job." (Tr. at 537) He testified that Vidal had expressed concern about Vidal's own bad credit, and that he therefore introduced Vidal to Carlos Felix, with a strong recommendation. Guillermo drove Vidal to New Jersey to meet with Felix. (Tr. at 537-38)

Some time after Vidal met Felix at Best Credit USA in New Jersey, Felix involved him in the scheme that is the subject of this indictment. As described by Ana Batista and Gloria Duarte at trial, they both hired Carlos Felix to fix their credit and allow them to get loans for businesses. Among other transactions, Felix got them loans to buy cars, and said that these loans would be converted into personal loans.[4] Carlos Felix gave Vidal the bank checks for the purchase of cars for some of Felix's clients. Vidal would deposit the checks under his business name and return the amount of the loan to Felix or his company, Best Credit USA, minus 10%, a fee described as a release that his business charged any customer who returned or declined to purchase a vehicle. Several of the form releases were admitted into evidence at trial.

It was undisputed at trial that Vidal was not involved in the filling out of car loan applications, made no false statements on any applications, and had no input into any bank or credit union's decision-making process. All the statements in the applications and all the documents submitted were submitted by Carlos Felix or employees of his company. The applications were signed by the borrowers. Gloria Duarte admitted to not only signing the loan applications, but to participating in the creation of false statements in the loan applications, to receive approval for the money she wanted. (Tr. at 394)

The only money Vidal made was the 10% "commission" he charged for returning the money to the purchaser, described in the Presentence Report ("PSR") as "illicit profits [which] total **$63,250.00**." PSR, ¶ 10. (Emphasis added.)

1. <u>The Loss Amount</u>

There are several things wrong with the PSR's calculation of the loss amount. First, the numbers identified in ¶ 20 are totaled incorrectly. The ten financial institutions contained in the graph are each identified with a loss amount. The PSR calculates that **$632,502.38** is owed in total to these institutions. However, the number amounts in ¶ 20 add up to **$599,839.88**.

Moreover, that same paragraph reflects a loss for Chartway FCU as **$141,755.26**, whereas what was proven at trial was loss based on one loan to Delfina Duarte and one to Terrence Patrick that are currently delinquent, but not charged off.[5] The government has given defense counsel a chart of the delinquencies currently existing from the loans that comprised the government's evidence at trial. *See* Delinquency Chart, attached as Exhibit 1. The Chartway delinquencies total **$79,841.93**.

In addition, many of the amounts claimed to be delinquent include interest and penalties that were not part of the original loan. Thus, it is impossible to arrive at a precise calculation of loss since the financial institutions are adding their own profit (in the form of interest and fees) to their original loan amount. For example, the Delinquency Chart provided by the government identifies the loss to NASA FCU for its loan to Delfina Duarte as $22,760.61, but that is more than the original loan of $20,000.00 awarded. Similarly, the Pentagon/Belvoir loan to Terrence

[4] See, e.g., the testimony of Ana Batista on direct examination: "He explained to me that even though I did not want a car that they could turn the loan into cash. That's what they were -- they explained to me, that there would be no problem." Tr. at 248.

[5] The other loan to Luis Ramos of $47,000.00 was paid back in full.

Patrick of $46,489.63 is inflated in the Delinquency Chart to $52,479.37, roughly $6,000.00 more than the original loan amount.

As another example, Ana Batista's Wells Fargo loan of $22,000.00 is not shown in Exhibit 1 as delinquent, and she testified at trial that she was behind but still paying (Tr. at 300). Yet that amount is included in the PSR chart in ¶ 20.

For all these reasons, it is submitted that the Court cannot rely on the figures in the PSR as a loss amount, nor on the numbers provided by the financial institutions to the government. The delinquencies reflected in Exhibit 1 are not all charged off, meaning that the bank or credit union is still working with the borrower on recouping the loan amount plus interest.

2. The Change of Guideline Levels

Given the above, the defense suggests that the PSR's guideline calculation in ¶¶ 28-37 should be changed as follows: Using Exhibit 1 as a guide, we ask that the Court include only those charged off amounts as the loss calculation. The loss amount would then equal **$182,121.87**. This would change the PSR's guidelines calculation: instead of adding 14 levels to the base level of 7, for a loss exceeding $550,000.00, the proper calculation would use the actual charged off amounts, for a loss exceeding $150,000.00. This would add 10 instead of 14 levels. Including the additional 2 levels for 10 or more victims, the total offense level would then equal **19** instead of 23.

With a Criminal History Category of I (which will be discussed below), Mr. Vidal would then face, under the USSG Sentencing Guidelines, 30-37 months of imprisonment.

3. Criminal History Category II Overstates Vidal's Criminal History

The PSR identifies a Criminal History Category of II because of Mr. Vidal's 1998 conviction in 2003 for Conspiracy to Distribute Narcotics, discussed in ¶ 40. This category overstates Mr. Vidal's criminal history, for the following reasons:

a. Even though his conviction was in 2003, Mr. Vidal was arrested in 1998, more than 15 years before the beginning of the alleged conspiracy in this case.

b. During the pendency of his 1998 case, for a period of roughly four years, Mr. Vidal cooperated with the government and provided vital information and testimony on the Cuevas drug organization throughout the time before he was sentenced in 2003. His willingness to provide information that might put him in danger is evidence of both his remorse for having been involved in the narcotics conspiracy and his desire to make things right.

c. As stated in ¶ 40 of the PSR, he made a favorable adjustment under supervision.

d. After his discharge from supervised release, Mr. Vidal did his best to live a law-abiding life, until he encountered Carlos Felix, the architect of the bank fraud scheme that is the subject of the indictment.

Section 4A1.3(b)(1) of the United States Sentencing Guidelines states, "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." After Mr. Vidal was arrested in 1998, he very quickly took responsibility for his actions and assisted the government for over four years. His prompt acknowledgement of his guilt (he pleaded guilty in April 1999) and his continued work with the government until 2003 distinguish him and cast this 2003 conviction in a different light.

Since then, until the one year that he met and did business with Carlos Felix, Vidal made every effort to conduct himself in a law-abiding manner. As related in the PSR, ¶¶ 62-67, which identifies his three parking garages and his used car business, and now his work as a mechanic in Pennsylvania, he worked and does still work extremely hard. He registered his businesses, paid taxes, and but for the one year that Carlos Felix invaded his life, made money legitimately.[6]

Because Mr. Vidal's behavior after arrest in 1998 shows true remorse and a desire to work with the government to remedy part of the problems that he caused, the Court should depart downward from Criminal History Category II.

*History and Characteristics of the Defendant:*

Mr. Vidal has lived legally in the United States since 1988 and has been married to Lourdes Vidal since 1990. They have three surviving sons, all adults. (Their youngest son, David, died of leukemia on June 20, 2006.) As described in the PSR at ¶ 51 and in his letter to the Court, the eldest, Ariel, is 30 years old and is employed for the past six years as a Detective with the City of Allentown, PA, police department. The second eldest, Erick, is 29 and has been employed for the past five years with the Lehigh County District Attorney's Office as a Central Booking officer. Eduar, aged 28, owns an auto mechanic's shop and car dealership, and also works as a truck driver. All three are married with children and live in Pennsylvania. Each has written a letter to the Court seeking leniency. According to Erick, Mr. Vidal now has six grandchildren and is "working on being a better grandfather than he was a father." [7]

As described in the letter of Lourdes Vidal, she and her husband raised their children to be "fair and honest" and are very proud of how the children turned out as adults. (Mr. Vidal, having lost his own business, currently works as an auto mechanic with his son Eduar. PSR ¶ 63.) The family all live in Pennsylvania and are a close-knit group. Recently, since his own father has gotten worse with Alzheimer's disease, Vidal has spent a great deal of time taking care of him. His sister, Fior de Morale, relates in her letter that her "father and mother depend absolutely on him for medical decisions…and [he] is the one who most of the time takes them to their medical appointments."

---

[6] It is significant to note that, after his year of activity with Carlos Felix, he did no more business with him, and continued to buy and sell cars from auto auctions through EV Auto Sales until 2020, when the pandemic caused him to shut down his business.

[7] This is a reference to the time he was away from his family due to his arrest in 1998, and his incarceration until 2003.

All of the letters from his children, siblings, nieces and nephews, sisters-in-law and daughters-in-law describe him as a caring, good-hearted person who would give the shirt off his back to another, and who took in family members when they first arrived in this country, keeping them for years without asking for anything in return. A friend of nine years, Ramon Infante, states that they have done several businesses together, and the friendship never changed, that Vidal is "a tremendous human being."

As discussed above in the Criminal History section, after Mr. Vidal was arrested in 1998, he very quickly took responsibility for his actions and assisted the government for over four years. His prompt acknowledgement of his guilt (he pleaded guilty in April 1999) and his continued work with the government until 2003 distinguish him and cast this 2003 conviction in a different light. In his own letter to the Court, Mr. Vidal relates that it was "the least I could do" to assist the government by delivering contraband and information, and by testifying in court. Other than that conviction, Mr. Vidal has tried to live a law-abiding life, while taking care of his immediate and extended family.

Mr. Vidal was examined by Dr. Alexander Bardey and Dr. Miranda Rosenberg of Fifth Avenue Forensics in May 2022. As related to the undersigned and described in the PSR ¶¶ 24 and 25, Mr. Vidal suffers from severe clinical depression, for which he has never been treated. Severe depression can manifest itself in the patient by mental confusion and memory loss. It is unknown how long he has suffered from this condition, and it raises the question of whether severe depression may have played a part in his participation in the activities that gave rise to the indictment and trial.

Having lived in the United States for over 30 years, it would be a tragic circumstance if he were to be incarcerated and then deported, with no ability to return to his family.

**<u>Factors Under 18 U.S.C. 3553(a)(2)</u>**

*The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.*

It bears noting that the main protagonists in the bank fraud perpetrated upon the victim financial institutions were neither indicted nor tried. Carlos Felix is still in the credit-fixing business. *See* promotional Instagram posts, sent to Lourdes Vidal on or about August 20, 2022, attached as Exhibit 2. Ana Batista and Gloria Duarte received non-prosecution agreements. These persons – as well as the other borrowers who did not testify and were not prosecuted – are directly responsible for the false statements in the fraudulent loan applications, that resulted in the issuance of loan awards. According to the testimony of Batista and Duarte at trial, Felix took 30% of each loan they received.

While this does not lessen the responsibility of Mr. Vidal for his part in depositing and/or cashing the auto loan checks and returning all but 10% to Carlos Felix, it highlights the disparity of roles and responsibility, such that to apply the guidelines calculations of the entire loan amount to this case well overstates Mr. Vidal's responsibility. Many courts dispute the weight given

almost exclusively to the loss amount by the Guidelines, and the failure of the guidelines to look at and take into account moral responsibility or nature of the individual's participation:

> The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor [but] the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting ... to assign precise weights to the theft of different dollar amounts. In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence. To a considerable extent, the amount of loss caused by this crime is a kind of accident, dependent as much on the diligence of the victim's security procedures as on [the defendant's] cupidity.

*United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (SDNY 2004). *See also United States v. Adelson*, 441 F.Supp.2d 506, 509 (SDNY 2006)(discussing the "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss... without, however, explaining why it is appropriate to accord such huge weight to such factors").

What Vidal did was to enable Carlos Felix to complete the scheme, and indeed this is a serious step, but not as serious as the acts performed by Felix and his employees. Vidal should have known from the start that this scheme was dishonest and illegal, but we respectfully ask the Court to remember that Mr. Vidal did in fact stop dealing with Felix years before he was arrested, and years before his business had to close due to the pandemic. Thus, his participation in the bank fraud scheme was limited in time not due to the interference of law enforcement, but by his own choice.

In other words, *he deterred himself* after wrongly participating for a year in the scheme. He needed no one to put pressure on him to stop depositing and cashing checks for Carlos Felix. This is something he did on his own and indeed it bears strongly on the idea of what constitutes "just punishment" and whether there is any need to impose a sentence of incarceration to reflect the seriousness of the offense.

*The need for the sentence imposed to afford adequate deterrence to criminal conduct.*

The letter from Eduar Vidal to the Court demonstrates great remorse for allowing himself to get involved with this bank fraud scheme. He is a religious man who, in his words, "didn't want to go against the government." His did not understand why, when he initiated the meetings with the government before he was indicted, that they would not accept his offer to help.

He continued to refuse to accept that he did something wrong, until he saw the evidence at trial. He is devastated because, in his words, "I had promised myself not to do anything that was against the law so as not to cause my family as much pain as I did once." Instead, he is living a "nightmare from which I have never found peace...and my family is being destroyed because of me...."

Because he is not a "hardened criminal" and is not looking to make money in an illegal manner, the sentence – to afford adequate deterrence to criminal conduct – need not be one of

prolonged incarceration. Indeed, home detention would serve as well. As stated above, Mr. Vidal deterred himself because he stopped doing business with Carlos Felix. He could have continued but did not. And while he refused to accept guilt while proffering to the government, he was willing to help since, in his words, "those people were still after me wanting to give me more checks." While the government is not obligated to accept help from someone who will not acknowledge guilt, we respectfully submit that the offer to help speaks to Mr. Vidal's desire *not* to participate in criminal conduct.

*The need for the sentence imposed to protect the public from further crimes of the defendant.*

Because, after ceasing the fraudulent business relationship with Carlos Felix on his own, Mr. Vidal evidenced a desire not to commit crimes, a non-incarceration sentence would serve the ends of protecting the public. As stated above on p. 2, a non-incarceration sentence does hold people accountable for breaking the law, and should Mr. Vidal violate the terms of his sentence, this Court can sentence Mr. Vidal to any sentence that could have been imposed under the guidelines.

**Conclusion**

As his own letter, and the letters from friends and family repeatedly point out, Mr. Vidal deeply regrets his actions and has learned a hard lesson from this experience. Indeed, the irony is that the money Mr. Vidal made from the bank loan scheme orchestrated by Carlos Felix was less than the money he made selling cars legitimately! Clearly, he was not participating in order to make a fortune from bank fraud.

This financial crime was not violent and did not seek to hurt individuals. As was shown at the trial, Mr. Vidal had absolutely no contact with the banks or credit unions. Further, until the acts complained of herein, and after those acts, he tried his best to act in a legal manner and run a legitimate business. As part of the sentence, Mr. Vidal would be happy if the Court imposed a condition that he is not to work in any field where cashing checks or moving money is part of the job. In this way the public would be protected from the type of conduct perpetrated in this case.

*Request for a Judicial Recommendation Against Deportation.* We ask that the Court recommend to the immigration judge that Mr. Vidal not be deported. While this is no longer part of the statutory framework of immigration law, such a recommendation has been done by a district court judge. *See United States v. Aguilar*, 133 F.Supp.3d 468 (EDNY 2015). If this Court would make an informal recommendation that the general practice of deportation should not be followed, it would be up to the immigration authorities to determine whether to accede to such a recommendation.

Respectfully submitted,

Camille M. Abate, Esq.

cc: AUSA Josiah Pertz and AUSA Jonathan Bodansky (via ECF)