**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 12, 2022

**BY ECF**
The Honorable Denise L. Cote
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007

**Re: *United States v. Eduar Vidal*, 21 Cr. 726 (DLC)**

Dear Judge Cote:

The Government respectfully submits this letter in advance of sentencing in this matter. For the reasons explained below, the Government submits that a sentence of imprisonment within the applicable Guidelines range of 51 to 63 months (the "Guidelines Range"), would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## I. Background

### A. The Fraudulent Car Loan Scheme

In 2015 and 2016, Eduar Vidal owned a small used car dealership on Webster Avenue in the Bronx, E&V Auto Sales Corp. ("E&V"). Between at least approximately June 2015 up to and including at least March 2016, Vidal and his coconspirators defrauded financial institutions, including credit unions and banks, into making hundreds of thousands of dollars in auto loans. As part of the scheme, individuals who ran a so-called credit repair service in New Jersey made fraudulent loan applications on behalf of borrowers. The applications contained false statements of the borrowers' income and employment, and falsely stated that the borrowers wanted to use the money to purchase a car from E&V, when in fact the borrowers were simply looking for a personal loan or seeking to improve their credit score. When the financial institutions issued the checks, Vidal would sign the back, cash them at a check cashing store, keep a 10% commission, and return the rest of the money to the borrowers and the credit repair service. The credit repair service would keep an additional 30%. The borrowers, who were already in dire financial condition, were extended loans that they did not have the means to pay back.[1] Most of the loans went into default, and there was no collateral for financial institutions to recover. (Presentence Report ("PSR") ¶ 8.)

[1] The borrowers knew that the money would not be used for its intended purpose, and therefore share some culpability in the scheme, but were nonetheless enabled by the scheme's other participants.

At trial, the Government introduced 18 fraudulent loan checks that the defendant negotiated. Each check was endorsed by the defendant, and usually named the car that the financial institution believed the check would be used to buy (usually including the car's vehicle identification number or VIN). Each check overlapped with at least one other check for the same vehicle from another financial institution; in other words, multiple financial institutions issued checks they believed were going towards payment for the same vehicle. Vidal's signature appeared, for instance, on four different checks, from different lenders, all intended for the same 2012 Infiniti SUV. The signature appeared on five checks for loans to three different borrowers, all supposedly buying a BMW X6. He signed two checks from two different credit unions, for the same BMW, that he cashed on the same day. These 18 checks were issued for the purchase of only five vehicles. (*See* GX 2901.) (PSR ¶ 9.)

Three representatives of victim institutions testified at trial. Their testimony highlighted certain key points. Car loans receive a preferential interest rate because a car is collateral that secures the loan. (*See, e.g.*, Trial Transcript 54-56; 176-79; 420:7-14.) Had the lenders known that a particular loan would not be used to buy a car, or that other lenders were issuing checks for the same car, the lenders never would have issued the loan. (*See, e.g.*, *id.*, 60:22-25; 65:4-7; 178:4-19; 182; 440.) Lenders made checks payable to dealers to protect against misappropriation of the funds. (*See, e.g.*, *id.* 67:17-23; 180-81.)

Two of Vidal's customers also testified. Both sought loans because of their bad credit, seeking to boost their credit scores, assist in their business ventures and pay off other debt; neither wanted to buy a car. (*See, e.g., id.*, 24:14-25:1; 329:9-17.) And both testified as to Vidal's participation in the scheme. Vidal helped them cash car loan checks, taking a percentage (*see, e.g.*, 255:2-16, 256-257; 340-41), but Vidal did not provide either of them with the car named on the loan check (*see, e.g.*, *id.*, 247:21-24; 351-52).

Indeed, one or more of the cars involved in Vidal's loan scheme were not even on E&V's lot at the time they were supposedly being sold. The New York State DMV has no record showing that the cars referred to on the fake loan applications were registered in New York State to Vidal, or to any buyer in New York State, at or around the time Vidal signed loan checks for the cars. According to Florida DMV registration records, a 2016 Honda Accord for which Vidal negotiated a fraudulent loan check and which he claimed to sell in the Bronx was registered in Miami, Florida at the time Vidal negotiated the fraudulent check. (PSR ¶ 12.)

B. <u>Losses</u>

The Government proved at trial that Vidal caused a total loss of $632,502.38. This figure represents the value of the fraudulent loans issued by credit unions and banks for vehicles that Vidal did not sell. For each of the loans in this total, more than one financial institution issued a check for the same car, underscoring the fraudulent nature of the transactions. (*See* GX 2901.) The Government introduced a summary chart listing each of the checks issued by financial institutions to E&V, specifying the lender, borrower, vehicle, check amount and check date. (*Id.*) Each of the checks was also separately introduced as an exhibit. (*See id.* (listing the exhibits summarized in

the chart).) (PSR ¶ 10.) Vidal's commission was approximately 10%. Accordingly, Vidal's illicit profits total approximately $63,250. (PSR ¶ 11.)

C. Vidal's Tax Returns

Evidence at trial also showed that, for tax years 2015 and 2016, Vidal made false tax filings that not only failed to report his income from the loan fraud scheme, but also took a deduction for the transfer of some of the funds back to the credit repair service. (PSR ¶ 13.)

In 2015, he reported sales at E&V of over $1 million, and in 2016, he reported sales of approximately $272,000. For each of those two years, E&V reported a loss, paying no income tax. The returns report that Vidal paid himself a salary of $18,200 each year, and no other compensation. This was inaccurate, as it omitted the tens of thousands of dollars in illicit commissions he made from the loan fraud, which, his accountant confirmed during his testimony, Vidal did not report as income. And although Vidal had employees at E&V, he failed to report paying them any salary, thereby avoiding employment taxes and regulations. (PSR ¶ 14.)

In order to reduce E&V's tax bill in 2015, Vidal took deductions based on checks written to the owner of the New Jersey credit repair service and the entities that individual controlled. For the 2014-15 tax year (and on an unknown date), E&V issued a 1099 to Best Credit USA LLC in the amount of $100,900. This was improper in multiple ways. First, refunds of fraudulently obtained car loans are not accurately characterized as independent contractor services and therefore are not appropriately listed on a 1099. Second, the 1099 was not issued in an amount representing the entire sum of loan funds E&V transferred back; instead, the amount represented a fraction of those funds, with the amount seemingly chosen only to offset E&V's income and thereby eliminate E&V's tax liability for the year. Third, several of these checks were not from the 2014-15 tax year (running from October 2014 to September 2015), and should not have been included in deductions for that year. As for one check included in the 1099, dated February 5, 2016, in the amount of $50,692.50, TD Bank has no record of it ever being negotiated. It appears that Vidal simply wrote information on a check and deducted that amount from his taxes, even though the money did not leave E&V's account for the purpose stated on the check. (PSR ¶¶ 15-18.)

D. Vidal's Failed Plea Allocutions and the Trial

On November 30, 2021, a grand jury returned a two-count indictment charging Vidal with bank fraud in violation of 18 U.S.C. § 1344 and bank fraud conspiracy in violation of 18 U.S.C. § 1349. On May 4, 2022 and May 10, 2022, pursuant to a plea agreement with the Government, Vidal attempted to plead guilty before trial to a one-count Information, charging him with one count of conspiring to commit bank fraud in violation of 18 U.S.C. § 371. However, the defendant failed to allocute to the crime, and the Court did not accept his plea. (*See* transcripts of plea hearings on May 4, 2022 and May 10, 2022.) Vidal admitted certain aspects of his fraudulent conduct. (*See, e.g.,* Tr. May 4, 2022, 17:21-24 ("THE COURT: And then you came to understand that it was part of a fraud because there were no cars actually being purchased. Do I understand that correctly? THE DEFENDANT: Yes.").) But he did not fully admit the conduct that the Government would go on to prove at trial. For instance, he denied knowing, at the time he cashed

the check for the 2016 Honda Accord, that the car would not be given to the person who had taken out the auto loan. (*See* Tr. May 10, 2022, 16:18-24.) He also claimed that, during the scheme, he "did not know that [he] was violating the law." (*Id.* 10:8-10.) And he asserted that, when he understood that the owner of the credit repair service and his customers were attempting fraud, he stopped. (Tr. May 4, 2022, 17-18.)

On May 11, 2022, a grand jury returned a superseding indictment, charging Vidal with bank fraud in violation of 18 U.S.C. § 1344 and bank fraud conspiracy in violation of 18 U.S.C. § 1349, and adding forfeiture allegations (the "Superseding Indictment"). Trial commenced on June 14, 2022 and summations concluded on June 21, 2022. That day, a jury returned a verdict of guilty on both counts of the Superseding Indictment. After conviction, the Court continued the terms of the defendant's bail.

## II. Presentence Investigation Report and Probation's Recommended Sentence

The United States Probation Office ("Probation") calculates the applicable Guidelines as 51 to 63 months' imprisonment, based on an offense level of 23 and a criminal history category of II. Dkt. No. 68 at 19. Probation recommends a custodial sentence of 51 months, followed by three years of supervised release, with this sentence running concurrently on each count of conviction. Probation also notes that the Court must order restitution and forfeiture. It specifies restitution in the amount of $632,502.38.

## III. The Defendant's Submission

The defendant's sentencing submission ("Def. Mem.", Dkt. No. 70) asks that the defendant be sentenced to a below-Guidelines term of 11 months in home detention. The submission focuses principally on the defendant's relative culpability, mental health challenges, and family ties. *Id.* 6-9. The defendant highlights that he stopped participating in the scheme before he was arrested. *Id.* 8. In support of his proposed sentence, he suggests that he faces a lesser chance of deportation if he is sentenced to under one year in prison. *Id.* 3. The submission accepts that Vidal did not accept responsibility for his crimes before trial. *Id.* 8.

The defendant objects to the loss calculation, offering that the appropriate amount is $182,121.87, which the defendant states represents outstanding delinquencies on the fraudulent loans, as reported to the Government to date by several (but not all) victim financial institutions. *Id.* 4-5. The defendant also argues that the defendant's criminal history category overstates his criminal history, on the grounds that, although he was convicted of several offenses in 2003, he was arrested for those crimes in 1998, and thereafter cooperated with the Government. *Id.* 5-6.

## IV. Discussion

### A. Applicable Law

#### 1. The Section 3553(a) Sentencing Factors

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**2. The Appropriate Measure of the Loss Amount Is the Intended Loss, Which Is the Full Amount of the Loans**

"[A] district court enjoys considerable discretion in calculating the loss applicable to a particular fraud, and need not determine the amount of loss with precision; instead, the district court need only make a reasonable estimate of the loss," U.S.S.G. § 2B1.1, cmt. n. 3(c)." *United States v. Nash*, 338 F. App'x 96, 98 (2d Cir. 2009) (citations omitted). In cases involving fraud, a "district court may presume that the defendant intended the victims to lose the entire face value of the [fraudulent] instrument, but the defendant may rebut the presumption by producing evidence to demonstrate that he actually intended to cause a lesser loss." *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) (quotations omitted).

Here, Vidal acquired the proceeds of loans that financial institutions issued because of fraudulent representations that Vidal and others made to the lenders. Vidal caused the loss because he lied about the purpose of the loans, representing, along with the borrowers, that the loans were for cars, when the funds were actually for the borrowers' personal use. This lie exposed the victim institutions to unexpected economic risk. *See United States v. Binday*, 804 F.3d 558, 570-71 (2d

Cir. 2015). The lenders never would have made the loans in the first place, or charged interest rates that were lower than the rates they charged for unsecured loans, had they known that the loans were not issued for the bona fide purchase of cars. Accordingly, the proper loss amount is the full amount of the fraudulent loans.

The most appropriate measure of the loss amount in this case is the "intended loss" under Application Note 3(A)(ii) to USSG 2B1.1, defined as "the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1 cmt. n. 3(A)(ii).[2] The intended loss is the full amount of the loans. Vidal intended that the credit unions and banks lend the full amount they did. No evidence suggests he intended for the money to be paid back; indeed, all signs point to the opposite. Vidal knew the borrowers were poor credit risks, as they were referred to him through a credit repair service for the financially desperate. He knew the borrowers were immediately giving him a substantial percentage of the loan proceeds as a fee, and were giving another piece of the loan proceeds to the credit repair company. He knew they were taking the loan proceeds in cash for personal use, were at times extracting even more cash from the lenders through credit card transactions at Vidal's dealership (*see* Trial Tr. 345), were not taking possession of a car that could be used as collateral, and were willing to lie to the institutions to get the money. It was clear to Vidal that these loans were not likely to be paid back.

### B. A Guidelines Sentence Is Reasonable In This Case

The Government respectfully submits that the application of the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) weighs in favor of a sentence within the stipulated Guidelines Range of 51 to 63 months' imprisonment. The factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others, and to promote respect for the law. 18 U.S.C. § 3553(a)(2)(A)-(C).

*First*, a sentence within the Guidelines Range would appropriately reflect the nature and seriousness of the defendant's conduct. The defendant repeatedly engaged in fraud, violating the trust of financial institutions and leaving borrowers deeper in debt as he lined his own pockets. Financial institutions that make auto loans are particularly reliant on auto dealers, who serve as gatekeepers to confirm that the purchase is genuine. Fraud of the kind Vidal engaged in is not possible without an unscrupulous dealer. Each of the checks in this case was made out to E&V. Vidal signed his name to those checks, making false assertions about his intention to provide a vehicle, and walked out of check cashing stores with substantial amounts of ill-gotten cash. Vidal may be less culpable than others involved in the scheme, as he did not play a leadership role or recruit victims. But his actions were not just harmful, they were essential to the scheme's success.

Once Vidal was caught, he minimized his conduct at every opportunity, proffering to the Government but refusing to admit wrongdoing, as the defense acknowledges. At trial, Vidal

---

[2] The Government has incomplete information about the actual loss to-date, as not all of the victim institutions have provided current balance information. The Government provided its current information to the defense. (*See* Def. Ex. 1.) Known delinquencies on the subject loans currently total $383,079.41.

championed the false argument that the fraudulent auto loans could properly convert to personal loans. This defied not only the written terms printed on the checks Vidal signed, but also common sense. It made no sense for Vidal to obtain the cumulative proceeds of 18 different checks for the sale of only five cars, or to take a cut of a loan expressly issued for the purchase of a 2016 Honda, knowing that no such car sat on his lot at the time. As further confirmation that Vidal's intentions were criminal, after obtaining tens of thousands of dollars in profits from the scheme, Vidal did not report these earnings on his business's tax returns. Vidal lied for money, repeatedly, and inexcusably. Such conduct demands a significant sentence.

*Second*, a sentence within the Guidelines Range is both sufficient and necessary to afford adequate deterrence to the defendant and others similarly situated and promote respect for the law. A Guidelines sentence would send a message to the defendant and others that the conduct the defendant engaged in will not be tolerated. It would also signal to others in the position the defendant occupied that whatever personal advantage an individual might seek through fraud – and no matter how tempting a criminal proposition from a would-be coconspirator might be – such activity is not worth the risk.

*Third*, the Guidelines Range of 51 to 63 months' imprisonment appropriately reflects the defendant's history and characteristics. This is his third time being sentenced, and his second before the United States District Court for the Southern District of New York. Vidal's prior convictions include possession of a forged instrument (during the arrest for which, he and another person were also apprehended with a loaded firearm), narcotics distribution conspiracy, money laundering conspiracy, and substantive money laundering. (PSR ¶¶ 39-40.) After his prior convictions, Vidal may have turned a corner for a time, but he then turned back to crime. This experience with the criminal justice system should have given him enhanced perspective as to the dangers of participating in a conspiracy such as the one he was convicted of joining, but it did not.

There is no basis for a downward departure in criminal history. Between 1995 and April 1999, Vidal participated in an extensive narcotics and money laundering operation. He was placed on supervised release on May 19, 2003,[3] the day of his sentencing for those crimes, and left prison shortly thereafter. Vidal's commission of the offenses of conviction here stretched from at least June 2015 through March 2016. The last of the conduct that formed the basis of his prior convictions occurred only slightly over 15 years before he began committing bank fraud, and well within 15 years since he was last released from incarceration (the applicable time period under U.S.S.G. § 4A1.2(e)(1)). Vidal was last sentenced with the benefit of a cooperation agreement, and may have been sentenced to an even longer period of incarceration had he not cooperated. Had his prior sentence been a full two years shorter, he still would have committed bank fraud within 15 years of his release from prison, and criminal history category II would still be appropriate.

The defendant, a lawful permanent resident of the United States, also argues, without basis, that a term of imprisonment of less than one year, or home detention, would allow him to remain in the United States. (Def. Mem. 3.) It is unclear from the defense submission why the length of incarceration would be relevant to the defendant's likelihood of deportation. Any alien who is

[3] The Bureau of Prisons website shows a release date of May 21, 2003.

convicted of an aggravated felony at any time after admission is deportable. 8 U.S.C. § 1227(a)(2)(iii). An aggravated felony includes an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000. 8 U.S.C. § 1101(a)(43)(M). That is the situation Vidal faces, regardless of his sentence.

In sum, a sentence within the stipulated Guidelines Range would adequately balance the various considerations under § 3553(a) and achieve the statute's stated objectives.

The Court must order forfeiture, representing the proceeds traceable to the commission of the offenses of conviction. For the reasons above, forfeiture should be ordered in the amount of $632,502.38. Pursuant to 18 U.S.C. § 3663A, the Court must also order restitution in the amount of $632,502.38, with the amounts due to each victim specified in the schedule set forth in the Presentence Report. (PSR ¶ 20.)

## V. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the Guidelines Range of 51 to 63 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/ T. Josiah Pertz
Josiah Pertz / Jonathan Bodansky
Assistant United States Attorneys
(914) 993-1966 / (212) 637-2385

cc: Camille Abate, Esq. (ECF)